1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

8
9
10
11
12

FLORIDA F.,[1]

            Plaintiff,

      v.

ANDREW SAUL,

            Defendant.

Case No.  20-cv-07948-RMI

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 19

13

14        Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying

15  her application for a period of disability and insurance benefits under Title II of the Social Security

16  Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals

17  Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security

18  which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to

19  the jurisdiction of a magistrate judge (dkts. 7 & 8), and both parties have moved for summary

20  judgment (dkts. 15 & 19). For the reasons stated below, Plaintiff's motion for summary judgment

21  is granted, Defendant's motion is denied.

22                              **LEGAL STANDARDS**

23        The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

24  conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

25  aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

26  error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

27  _____

28  [1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

United States District Court
Northern District of California

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On February 8, 2018, Plaintiff filed an application for Title II benefits, alleging (as later amended) an onset date of August 19, 2013. *See* Administrative Record "AR" at 22.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on April 17, 2019. *Id*. at 15-29. The Appeals Council denied Plaintiff's request for review on September 17, 2020. *See id*. at 1-6. Thereafter, on November 11, 2020, Plaintiff sought review in this court (dkt. 1) and argued *inter alia*: that the ALJ erred at Step Two by failing to discuss or mention two of Plaintiff's impairments; and, that the ALJ erred in evaluating Plaintiff's testimony and the medical opinions of the treating and reviewing doctors. *See* Pl.'s Mot. (dkt. 15) at 15-27. Defendant contends that no such errors were committed, and that each of the ALJ's findings rests on a foundation of substantial evidence. *See* Def.'s Mot. (dkt. 19) at 19-30.

## SUMMARY OF THE RELEVANT EVIDENCE

### *Medical Evidence from Plaintiff's Treating Physicians*

In the midst of a career in the financial services and accounting sector, Plaintiff developed severe carpal tunnel syndrome in 2003. *See* AR at 313. During the course of the following two

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #12. *See* (dkts. 12-1 through 12-35).

United States District Court
Northern District of California

years, she underwent remedial surgery and established what would be a longstanding treatment relationship with Dori J. Cage, M.D., an orthopedic surgeon and hand specialist. *See id*. at 300, 302-03, 313, 937-940, 943-946, 956-957, 966, 1050-1051, 1054-1055, 1057-1058, 1061-1062, 1064, 1071-1073, 1076-1078. Plaintiff's surgeries were not entirely successful as she continued to experience persistent symptoms of bilateral carpal tunnel syndrome, as well as symptoms from certain other conditions affecting her hands and arms such as bilateral ulnar neuritis, right lateral epicondylitis, and hypothenar dimpling syndrome – her symptoms included: tingling in both hands, finger locking, spasms in her left hand, daily numbness, right elbow pain, and shooting pain (similar to the feeling of an electric shock) in her hands and forearm. *Id*. at 938, 943-945, 950, 963, 966, 1072, 1076. Plaintiff would experience pain in virtually every use of her hands including after driving, using the computer mouse, and after a few minutes of typing – furthermore, Plaintiff experiences an increased tendency to drop objects. *Id*. at 944, 963.

As early as 2006, Dr. Cage opined that Plaintiff should be limited to working no more than 4 hours per day, while limiting her use of the keyboard or any writing instrument to "short intervals as tolerated." *See id*. at 945, 957, 966. Given that Plaintiff was still positive for the Tinel's sign (an indication that she was still afflicted with carpal tunnel syndrome), another of her treatment providers (Catherine Jiam Seagren, M.D.) referred Plaintiff to a specialist for nerve conduction studies. *Id*. at 937. Throughout 2006, Dr. Cage held the opinion that Plaintiff's recovery had hit a wall and that she would need permanent work restrictions. *Id*. at 940-43; *see also id*. at 938-40, 1072 (wherein Dr. Cage opines that Plaintiff could only sustain work with minimal hand activity); *see also id*. 1071-72, 1078 (limiting Plaintiff to less than ten cumulative minutes of typing in any given hour; and, for writing, Plaintiff was limited to short intervals of less than ten to fifteen minutes at a time, interspersed with ten to fifteen minute breaks; Dr. Cage also found that Plaintiff was incapable of "repetitive gripping and squeezing" with either hand). Thereafter, in 2008 and 2009, Dr. Cage concluded that Plaintiff's chronic conditions had not substantially improved. *See id*. at 1061-1062, 1064.

Meanwhile, in 2009, Plaintiff was diagnosed with chronic left occipital neuralgia and facial neuropathy, reporting pain in her head and face at the severity level of 8 on a scale of 1 to 10 –

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff described it as a "sharp, stabbing, electrical shock-like pain." *See id*. at 414-415, 419, 422-423, 425-426, 428, 430, 432-433, 435, 437, 439-440, 594-596, 605. Over the course of the subsequent three years, between 2009 to July 2012, Plaintiff was treated with left occipital neural blockade therapies (which can range from injecting a problematic nerve with certain chemicals designed to interfere with the communication of pain signals, to the surgical destruction of a damaged peripheral nerve). *See id*. at 414, 419, 422-423, 425-426, 428, 430, 432-433, 435, 437, 439-440. This course of treatment only afforded her partial and temporary relief in that Plaintiff continued to report her experiences with pain as being largely similar to what was the case before the nerve block therapy. *See id*. at 414, 419, 422-423, 425-426, 428, 430, 432-433, 435, 437, 439-440, 483. Plaintiff's other attempts at pain relief saw her turn to acupuncturists and chiropractors but to no avail (*see e.g.*, *id*. at 432-33).

In 2010, Plaintiff's cranial neurological conditions included diagnoses for (1) occipital neuralgia and neuritis, (2) facial neuropathy, and (3) trigeminal neuralgia.[3] *See id*. at 432-34. During that period, Plaintiff received a left-sided glycerol injection for trigeminal neuralgia, which helped to abate the pain in the lower part of her face, but not around her eyes. *See id*. 432, 3015. Her doctors then tried to lessen her pain with gabapentin, however, Plaintiff found gabapentin to constitute a bit of a Pyrrhic victory – if even that – because it was only somewhat effective in lessening her pain while also causing her to experience excessive degrees of sedation, ataxia, fatigue, nausea, mood disturbances, and feelings of intoxication. *See id*. 483, 595, 605. Other medications (such as Cymbalta) also proved ineffective. *Id*. at 486, 495. In fact, Plaintiff's nearly constant experience with pain and with the various medicinal regiments to which she has been

---

[3] "Trigeminal neuralgia is a condition characterized by pain coming from the trigeminal nerve, which starts near the top of the ear and splits in three, toward the eye, cheek and jaw. We have two trigeminal nerves for each side of our face, but trigeminal neuralgia pain most commonly affects only one side. The pain of trigeminal neuralgia is unlike facial pain caused by other problems. It is often described as stabbing, lancinating or electrical in sensation and so severe that the affected person cannot eat or drink. The pain travels through the face in a matter of seconds, but as the condition progresses, the pain can last minutes and even longer. Trigeminal neuralgia is sometimes known as *tic douloureux*, which means 'painful tic.'" *See* "Trigeminal Neuralgia," on the website of the Johns Hopkins School of Medicine, available at: https://www.hopkinsmedicine.org/health/conditions-and-diseases/trigeminal-neuralgia (last checked on March 13, 2022 at 1:49 pm)

4

1    subjected combined to cause her to experience cognitive difficulties. *See id*. at 486, 495.

2        As part of what appears to be a systematic breakdown of Plaintiff's entire nervous system,

3    in early 2010, Plaintiff began to experience pain that would radiate from her right wrist all the way

4    to her neck. *Id*. at 1057. Several weeks later, she began to experience finger pain and numbness in

5    her right hand, along with a radiating pain in her forearm and shoulder – for which she was

6    referred to physical therapy and for an injection in her right shoulder. *Id*. at 1054-55. Thereafter, in

7    January 2011, Plaintiff began to experience hand pain, at the base of her thumb and other fingers,

8    that similarly radiated to points midway up her arm. *Id*. 1050. On this occasion, Dr. Cage observed

9    that Plaintiff was experiencing grip weakness in her right hand. *Id*. The following year, in mid-

10   2012, Dr. Cage found that Plaintiff was experiencing bilateral lateral epicondylitis (inflammation

11   of the tendons of the elbow), bilateral carpal tunnel syndrome, and right shoulder pain. *Id*. 300-02.

12       During the subsequent two-year period, between 2012 and 2013, Plaintiff was diagnosed

13   with scoliosis (an abnormal sideways curvature of the spine) which was attended with multilevel

14   degenerative disc disease (*id*. 506, 516, 768, 770) causing pain that ranged from dull to intense

15   while walking or engaging in other ordinary activities of daily life (*id*. 618, 622-623), gait

16   instability (*id*. 618, 622), pain and weakness in her left arm (*id*. 519), as well as chronic knee pain

17   (*id*. 607). During this period, Plaintiff's pain in the left occipital part of her head persisted (at a

18   severity level of 8 on a scale of 1 to 10), which in turn caused her to experience further mood and

19   sleep disturbances. *Id*. at 412-14. To make matters worse, in 2013, she was diagnosed with Chiari

20   malformation (Type-1) with severe syringomyelia,[4] for which Plaintiff underwent decompression

21   surgery. *Id*. at 309-15, 381, 383, 782. Some of the associated symptoms that Plaintiff continued to

22

23   _____

24   [4] "Chiari malformation [] is a condition in which brain tissue extends into the spinal canal. It occurs when
     part of the skull is misshapen or smaller than is typical, pressing on the brain and forcing it downward . . .
     Doctors categorize Chiari malformation into three types, depending on the anatomy of the brain tissue that

25   is displaced into the spinal canal and whether developmental problems of the brain or spine are present.
     Chiari malformation type 1 develops as the skull and brain are growing . . . Some people with Chiari

26   malformation also develop a condition called syringomyelia, in which a cavity or cyst (syrinx) forms within
     the spinal column." *See* "Chiari Malformation," on the website of the Mayo Clinic, available at:

27   https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last

28   checked on March 13, 2022, at 2:37 pm).

experience even after the surgery were: worsening headaches with photophobia, involuntary twitching and ataxia (loss of muscle control), myoclonic jerking, left-sided weakness, gait and mobility problems, diplopia (double vision) and blurry vision, as well as concentration deficits and word-finding difficulties. *See id*. at 309, 412. Accordingly, she was thereafter referred for further nerve blocking therapy. *Id*. at 412. During the remainder of 2013, these symptoms persisted. *See id*. 309-10, 1004 (ataxia and myoclonic jerking); *id*. at 310-11 (lack of mobility and balance problems); *id*. at 307 312-313, 315, 356, 545, 555 (worsening head pain, gait and mobility problems requiring a walker or wheelchair, severe memory loss, cognitive deficits, stabbing pains in the upper back and shoulders, and increased neuralgia); *see also id*. at 351, 353, 1000 (head pain, gait imbalance, vertigo, and cognitive difficulties). So dire was the combination of Plaintiff's conditions, that her neurosurgeon (Sohaib Kureshi, M.D.) noted in mid-2013 that, despite the surgeries and various other interventions such as nerve block treatments and medications, "[t]he patient has no change in her neurological condition [as] [s]he continues to [] complain[] of headaches, gait imbalance, vertigo, as well as [a] constellation of other symptoms that appear not to relate to her findings on MRI including cognitive difficulties." *See id*. at 999-1000.

Later that year, in the Fall and Winter of 2013, Plaintiff underwent treatment by Eric S. Hsu, M.D. (an anesthesiologist specializing in pain management) in the nature of certain injections directly into the occipital nerve in the back of her head. *Id*. at 3334, 3343. Dr. Hsu noted that Plaintiff still suffered from "persistent occipital headaches" and "intractable pain that consists of both [a] neuropathic and [a] nociceptive pain component." *Id*. at 3337. Plaintiff's pain was constant and described as "aching, burning, pinching, sharp, soreness, stabbing, stiffness, throbbing and tingling in nature." *Id*. 3334. She also experienced dizziness, ringing in her ears, and widespread pain and weakness throughout her face, head, and neck. *Id*. at 3335. Throughout 2014, Plaintiff continued to be riddled with pain ranging from occipital pain in the back of her head to leg pain requiring the continued use of a walker. *See id*. at 3347. Additionally, during this period, Dr. Cage noted that Plaintiff continued to experience "numbness in both hands, and pain at the base of the right hand . . . [as well as] weakness and bruising of the hands [in addition to the fact that] [o]n the left, all fingers go numb, but the pain is in the ring and small fingers." *Id*. at

1046.

In April of 2015, Dr. Hsu would add several diagnoses to Plaintiff's growing list of conditions – he noted that Plaintiff was "[c]urrently also having low back pain with anterior thigh pain, suggestive of sacroilitis vs. L-4 radiculopathy"; Dr. Hsu added that Plaintiff's "chronic pain syndrome has caused significant negative impact on daily activity, functional capacity, and quality of life." *Id*. at 3394. That same month, another of Plaintiff's treatment providers, Kim Doojin, M.D., noted that her neck pain registered at a severity level of 8 out of 10, while her lower back back pain was a chronic, dull pain at the severity level of 6 out of 10. *See id*. 3388. Several months later, in September of 2015, Plaintiff began to experience numbness in her toes, pain in the heels of both feet, and intermittent leg weakness. *Id*. at 550. Despite further nerve block therapy sessions, as well as physical therapy, medications, chiropractic intervention, acupuncture sessions, occipital nerve injections, and numerous surgeries, Plaintiff continued to experience chronic pain from the occipital portion of her head all the way down to her heels and toes throughout 2015 and 2016. *See id*. at 555, 746, 412, 558, 409, 612, 615, 407.

Thereafter, in the Fall of 2016, MRI imaging revealed that Plaintiff was also afflicted with "multilevel degenerative disc disease with disc desiccation and posterior disc bulges extending from C3-C4 through C6-C7," along with uncovertebral joint hypertrophy of the cervical spine, moderate left neural foraminal narrowing at C4-5, moderate bilateral neural foraminal narrowing at C5-6, and moderate right and moderately severe left neural foraminal narrowing at C6-C7. *Id*. at 792. A few months later, in July of 2017, Plaintiff was diagnosed with plantar fasciitis (inflammation of the connective tissues in the heel) in both feet and tendonitis in both of her Achilles tendons. *Id*. at 838. It should also be noted that throughout 2017, 2018, and 2019, Plaintiff continued to suffer from pain in the occipital portion of her head, her face, her neck, her arms, her hands and wrists, her back, he legs, and her feet. *See id*. 1042, 828-29, 3218 (Plaintiff's chronic back pain that radiated to her thigh and shin with intermittent toe numbness in both feet); *see also id*. at 822 (Plaintiff experienced dizziness, nausea, dysesthesia in her feet, and occipital headaches); *see id*. at 818-19 (right thumb arthritis and knuckle soreness, along with weakness in her hands and legs); *id*. at 3240 (dizziness and low back pain); *see id*. (Plaintiff feels widespread

weakness, causing her to occasionally collapse); *id*. at 3209 (Plaintiff continues to experience widespread neck pain, chronic low back pain radiating to both thighs, intermittent toe numbness in both feet, and frequent but intermittent shooting pain in the occipital part of her head, as well as a "constant burning pain" that radiated "from the craniocervical junction, along the ears, to the top of her head.").

### *Plaintiff's Hearing Testimony*

On June 19, 2019, the ALJ conducted a hearing at which testimony was heard from Plaintiff, as well as from a vocational expert ("VE"). *See id*. at 37-72. Plaintiff testified that she is only able to drive on "good days" and for short distances only. *Id*. at 40. Plaintiff's last attempt at working (which proved unsuccessful) came in the form of serving as a receptionist in her sister's dental office for as little as a two-hour period. *Id*. at 41. Plaintiff noted that her chronic and widespread pain continued to plague her and that, by way of example, she would be able to use a computer for only about twenty minutes before her wrist pain would force her to take a break. *Id*. at 45. In fact, during the course of the hearing, Plaintiff stated that the reason she was seen to be fidgeting with her hands was that she was experiencing pain due to the fact that she had avoided taking her pain medication such that she could testify coherently (something which her medications would preclude). *Id*. at 45-46.

Plaintiff added that her pain and other symptoms saw to it that she was no longer able to function in any of her former occupations because the condition of her hands made it impossible for her to use computers, to do paperwork, or to engage in fine or gross manipulation with her hands or fingers. *Id*. at 46-48. She also noted that – during the hearing – she was experiencing leg pain (which is more intense on the left side), as well as experiencing symptoms associated with her syringomyelia including problems with balance, headaches, and dizziness (which is aggravated when she tilts her head up or down). *Id*. at 51.

After her spinal surgery in 2013, Plaintiff was unable to walk and was relegated to the use of a wheelchair (for three months), after which she was dependent on the use of a walker for another eight months. *Id*. at 55. During that period, Plaintiff required a great deal of assistance (from her daughter or husband) for tasks as routine and mundane as using the restroom. *Id*. at 55-

8

58. Indeed, Plaintiff's wrist and hand weakness rendered her into an ineffective user of the walker and cane – thus, she needed assistance from her husband or daughter for the duration of that recovery period (a year). *See id.* Even after that recovery period, Plaintiff continued to depend on her husband's assistance with daily tasks such as showering and getting dressed due to a high risk of falling because of her unsteadiness, dizziness, and balance issues. *Id.* 57-58. Because her husband is retired, Plaintiff is able to constantly rely on his assistance around the clock due to her constant pain, her inability to walk properly, her inability to use her hands in any effective fashion, and also due to the side effects of her medications. *See id.* 58-59.

Plaintiff also noted that the nature of her chronic pain is such that it interferes with her ability to focus. *Id.* at 59. Plaintiff's husband is scared to let her walk on her own given the high likelihood that her dizziness and balance issues would cause her to fall. *Id.* at 59-60. Plaintiff then added that she would not be able to work because of her pain, her inability to walk, her inability to work on her feet, her inability to use her hands in any effective manner, and her inability to maintain attention or sit for long periods of time. *Id.* at 60-63. Lastly, Plaintiff noted the circular and self-worsening nature of her difficulties in that the financial strains associated with her inability to work sometimes result in her inability to afford medical treatment. *Id.* at 61.

*Testimony from the VE*

In pertinent part, the VE testified that if someone were off-task as little as 15% of the time, that person would not be able to maintain employment. *Id.* at 68.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[5] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id.* § 416.920(a)(3)), and must use a five-

---

[5] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless it is necessary to note otherwise.

United States District Court
Northern District of California

1    step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

2    416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

3    the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

4        Here, the ALJ set forth the applicable law under the required five-step sequential

5    evaluation process. AR at 23-24. At Step One, the claimant bears the burden of showing she has

6    not been engaged in "substantial gainful activity" since the alleged date on which the claimant

7    became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to

8    be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ in this case

9    found that Plaintiff last met the insured status requirements of the Social Security Act on

10   September 30, 2013, and that she had not engaged in substantial gainful activity since August 19,

11   2013, the alleged onset date, through September 30, 2013 (Plaintiff's date last insured). *AR* at 24.

12   At Step Two, the claimant bears the burden of showing that she has a medically severe impairment

13   or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not

14   severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no

15   more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d

16   683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that

17   Plaintiff suffered from the following severe impairments: neurocognitive disorder, spine disorder,

18   and carpal tunnel syndrome. AR at 24.

19       At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

20   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

21   burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant

22   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

23   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

24   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

25   combination of impairments that met or medically equaled the severity of any of the listed

26   impairments. AR at 25. Next, the ALJ determined that Plaintiff retained the RFC to perform the

27   full range of light work with the following exceptions and limitations: she is limited to lifting and

28   carrying 20 pounds occasionally and 10 pounds frequently; she can sit for six hours in an eight-

United States District Court
Northern District of California

1   hour workday; she can stand and walk for six hours in an eight-hour workday; she should never

2   climb ladders ropes, or scaffold; she can occasionally stoop and crawl; and she is limited to

3   frequent handling and fingering. *See* AR at 25-28.

4       At Step Four, based on the RFC and the testimony of the vocational expert, the ALJ

5   determined that Plaintiff is able to perform her past relevant work as a financial accounting officer,

6   or a program analyst, or a budget consultant. *See* AR at 28-29. Thus, the ALJ concluded that

7   Plaintiff had not been under a disability, as defined in the Social Security Act, at any time between

8   the alleged onset date, August 19, 2013, and the date last insured, September 30, 2013. *Id*. at 29.

9                                   **DISCUSSION**

10      Given that the ALJ found that Plaintiff could perform light work while lifting and carrying

11  as much as 20 pounds occasionally, and 10 pounds frequently, as well as standing or walking or

12  sitting for as much as 6 hours in an eight-hour workday (attended with occasional stooping and

13  crawling, and frequent handling and fingering) (*see id*. at 25), it does not require much

14  investigation to conclude that the ALJ rejected the entirety of the above-recited evidence. For the

15  reasons discussed below, the court finds that the ALJ improperly rejected the above-narrated

16  evidence (which constitutes the only body of substantial evidence in the record of this case) while

17  seizing upon isolated nuggets of information (much of which is patently irrelevant) from here and

18  there within this record as part of an effort to justify the RFC and the non-disability finding. As

19  discussed below, the court finds that the ALJ's conclusions are wholly untethered from any

20  quantum of substantial evidence that might be found in the record before this court.

21      As for Plaintiff's testimony, the ALJ merely stated that while Plaintiff's medically

22  determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's

23  statements about the intensity, persistence, and limiting effects of these symptoms were not

24  entirely consistent with the medical evidence and other evidence in the record. *See id*. at 26. The

25  ALJ's use of this oft-appearing boilerplate is problematic for several reasons. First, the court is

26  unable to discern which parts of Plaintiff's testimony are not "entirely" consistent with which

27  portion of the medical evidence – thus, the ALJ's statement rejecting Plaintiff's testimony is non-

28  specific. Second, the ALJ's rejection of Plaintiff's testimony is unclear and unconvincing because

United States District Court
Northern District of California

11

1    Plaintiff's testimony and the medical evidence are in fact wholly consistent and harmonious and,

2    together, they paint the unmistakable picture of a person who is riddled with pain quite literally

3    from head-to-toe and is therefore obviously unable to work in any capacity at all.

4         The Commissioner uses a two-step analysis to determine the credibility of a claimant's

5    symptoms. *See* SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *3 (Mar. 16, 2016). If the

6    claimant produces evidence of an underlying impairment "which could reasonably be expected to

7    produce the pain or other symptoms alleged," and there is no evidence of malingering,[6] the ALJ

8    must evaluate the intensity and persistence of the symptoms to determine the extent to which the

9    claimant's symptoms limit the ability to perform work-related activities. *See Lingenfelter v.*

10   *Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). In this regard, the ALJ must compare the claimant's

11   subjective complaints to the objective medical evidence in the record and must identify specific,

12   clear, and convincing reasons supported by substantial evidence in the record to support his or her

13   credibility analysis. *Lingenfelter*, 504 F.3d at 1036. This is the highest standard that an ALJ is

14   required to meet in Social Security cases. *See Garrison v. Colvin*, 759 F.3d 995, 1001 (9th Cir.

15   2014). In determining a claimant's credibility, the ALJ may consider the objective medical

16   evidence, the claimant's history of treatment, work activities, and activities of daily living. *See*

17   *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). "General findings are insufficient; rather,

18   the ALJ must identify what testimony is not credible and what evidence undermines the claimant's

19   complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

20        In light of the evidence described above, the ALJ's explanation for discounting Plaintiff's

21   testimony fell short of these standards: (1) because the ALJ merely rendered generalized non-

22   specific findings (in that the ALJ failed to expound on which parts of Plaintiff's testimony were

23   inconsistent with which parts of the record); (2) because the ALJ's credibility determination flies

24   in the face of an overwhelming torrent of medical evidence that amply supports her testimony –

25   and thus, the ALJ's rejection of Plaintiff's testimony was not only not based on substantial

26   evidence, it was based on a total misapprehension of the record; and, (3) for these reasons, the

27

28   ────────────────
     [6] There has been no suggestion – let alone any evidence – that Plaintiff has been malingering in this case.

United States District Court
Northern District of California

1    ALJ's reasoning was unclear and unconvincing. Therefore, because the ALJ improperly rejected

2    Plaintiff's pain and symptoms testimony, the entirety of that testimony (as set forth above) will

3    now be credited as true as a matter of law. *See e.g.*, *Christopher E. v. Comm'r of SSA*, No. 6:18-

4    cv-00824-MK, 2019 U.S. Dist. LEXIS 132507, at *26 (D. Or. Aug. 7, 2019) ("The ALJ's

5    statement is conclusory, and his analysis provides no specific, clear and convincing reasons based

6    on substantial evidence. For this reason alone, Plaintiff's testimony is credited as true."); *see also*

7    *Abraham A. v. Saul*, No. 19-cv-04350-RMI, 2021 U.S. Dist. LEXIS 47072, at *20 (N.D. Cal. Mar.

8    11, 2021) (same).

9            As to the medical evidence outlined above, the ALJ effectively discounted it all (as is

10   evident from the RFC that was formulated) by focusing on isolated snippets of information that

11   was most often inserted into the record by intake personnel rather than Plaintiff's doctors. *See* AR

12   at 26-27. For example, notwithstanding the countless number of times that Plaintiff's doctors

13   noted her unsteady and uneven gate, the ALJ (without any citation to the record) noted that

14   Plaintiff's "gait was at times observed to be normal." *See id.* at 26. In similar fashion, the ALJ

15   noted (again, without citation to the record) that on one occasion, [i]maging was noted to show

16   stable postsurgical changes after her decompression surgery." *Id.* at 26. Then, seemingly grasping

17   at straws (and again, with no citation to the record), the ALJ added that on one occasion,

18   Plaintiff's "bulk and tone were noted to be normal." *Id.* at 27. If Plaintiff's impairment involved

19   atrophy or dystrophy of musculature then, perhaps, such an observation might be relevant –

20   however, under the circumstances involved in this case, that assertion is irrelevant. In similar

21   fashion, the ALJ then noted that Plaintiff was "well nourished" and that her "lungs were clear

22   bilaterally, and she exhibited a regular cardiovascular rate and rhythm." *Id.* Once again, these

23   observations could only be potentially relevant if Plaintiff had complained of anorexia or of a

24   pertinent pulmonary or cardiac condition; however, because such has not been the case, the ALJ's

25   notations along these lines are so irrelevant as to warrant no serious discussion at all. Similarly,

26   when the ALJ notes that "[b]rain imaging from 2016 was normal," the court is left wondering how

27   such an observation could possibly justify (in part or in whole) the effective rejection of the above-

28   discussed body of medical evidence. Then, after a few more observations of this type, the ALJ

United States District Court
Northern District of California

13

1    simply stated that [t]aking the above into consideration," Plaintiff retains the ability to perform at

2    the levels espoused in the above-described RFC. *Id*. at 27. The court finds that ALJ's decision in

3    this case made it clear that the RFC was based entirely on the opinions of non-treating non-

4    examining consultants working for the Disability Determination Services because, as the ALJ put

5    it, "[t]hese doctors are experts in disability evaluation under the Social Security Act," *Id*. at 27.

6         "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an

7    ALJ may only reject it by providing specific and legitimate reasons that are supported by

8    substantial evidence." *See Farnsworth v. Kijakazi*, No. 21-35088, 2022 U.S. App. LEXIS 5973, at

9    *2 (9th Cir. Mar. 8, 2022) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). In

10   light of this, the court finds that the ALJ's explanations for rejecting the medical evidence in this

11   case were both non-specific and illegitimate, and further that the ALJ's rejection of this evidence,

12   and indeed the RFC itself, was wholly unsupported by substantial evidence. Defendant states that

13   the Agency's recent promulgation of certain new regulations "eliminate[ing] any semblance of a

14   hierarchy of medical opinions based on the nature of the claimant's relationship with a medical

15   source," has had the effect of rendering binding precedent in this Circuit, such as *Bayliss* and

16   *Garrison*, "no longer valid." *See* Def.'s Mot. (dkt. 19) 12-15.

17        However, for the reasons stated by Plaintiff (*see* Pl.'s Reply (dkt. 20) at 10-12) the court

18   disagrees with Defendant's view as to the upshot of the Agency's new regulations. As noted by

19   Plaintiff, "[t]he new regulations do not clearly supersede the 'specific and legitimate' standard . . .

20   [because] [t]hat standard is not an articulation of how ALJs must weigh or evaluate opinions, but

21   rather a standard by which *the court* evaluates whether the ALJ has reasonably articulated their

22   consideration of the evidence." *See id*. at 10. Thus, "[w]hatever factors the Commissioner

23   considers in evaluating a medical opinion, an ALJ must explain their reasoning to allow for

24   meaningful judicial review, and the Ninth Circuit's 'specific and legitimate' standard is merely a

25   benchmark against which the Court evaluates that reasoning." Pl.'s Reply (dkt. 20) at 10-11)

26   (citing *Kathleen G. v. Commissioner of Social Security*, 2020 WL 6581012 (W.D. WA Nov. 10,

27   2020); *Carol D. v. Commissioner of Social Security*, 2021 WL 2981193 (W.D. WA July 15,

28   2021); *Hamilton v. Commissioner of Social Security*, 2021 WL 2895098 (WD WA July 9, 2021);

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must [also]

2    consider the entire record as a whole and may not affirm simply by isolating a specific quantum of

3    supporting evidence."); *see also Thompson v. Comm'r of Soc. Sec.*, No. 2:20-CV-0003-KJN, 2021

4    WL 1118656 at *8 (E.D. Cal. Mar. 24, 2021) ("the ALJ is still required to fully articulate the

5    rationale relied upon" in part because "'[t]he ALJ must provide sufficient reasoning that allows for

6    review.'" (quoting *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020))).

7         In any event, even if Defendant is correct in assuming that the promulgation of new

8    regulations managed to upend decades of Ninth Circuit precedent governing how federal courts

9    review the explanations given by ALJ's for rejecting evidence in social security cases, it cannot be

10   argued that an ALJ's non-disability decision that is unsupported by substantial evidence can be

11   allowed to stand. This is so because – be it under new regulations or old ones – the findings of the

12   Commissioner of Social Security "shall be conclusive" only "if supported by substantial

13   evidence." *See* 42 U.S.C. § 405(g). In short, for the reasons stated above, the court finds that the

14   ALJ's rejection of the above-discussed evidence was unsupported by substantial evidence.

15   Therefore, because the ALJ improperly rejected the medical evidence discussed above, that

16   evidence will now be credited as true as a matter of law. *See Lester*, 81 F.3d at 834 ("[w]here the

17   Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or

18   examining physician, we credit that opinion as a matter of law."); *see also Benecke*, 379 F.3d at

19   594 ("Because the ALJ failed to provide legally sufficient reasons for rejecting Benecke's

20   testimony and her treating physicians' opinions, we credit the evidence as true.").

21                              **Nature of Remand**

22        As for the nature and scope of the remand, the decision whether to remand for further

23   proceedings or for payment of benefits generally turns on the likely utility of further proceedings.

24   *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1169 (9th Cir. 2008). A district court may "direct an

25   award of benefits where the record has been fully developed and where further administrative

26   proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for

27   the Ninth Circuit has established a three-part test "for determining when evidence should be

28   credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th

15

1 | Cir. 2000). Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed
2 | to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues
3 | that must be resolved before a determination of disability can be made; and, (3) it is clear from the
4 | record that the ALJ would be required to find the claimant disabled were such evidence credited.
5 | *Id*. The second and third prongs of the test often merge into a single question; that is, whether the
6 | ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178
7 | n.2; *see also Garrison*, 759 F.3d at 1021-23 (when all three conditions of the credit-as-true rule are
8 | satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant
9 | is, in fact, disabled, a remand for a calculation and award of benefits is required).

10 |     Initially, the court will note that in light of the above-discussed and improperly discredited
11 | testimony and medical evidence, two things are clear: first, it is clear that Plaintiff has in fact been
12 | disabled since her alleged onset date, and second, it is clear that further administrative proceedings
13 | would be useless because no further record development is necessary as the ALJ would be
14 | required to find Plaintiff disabled on remand based on the evidence and testimony that have been
15 | herein credited as true. This is true for a number of reasons. First, it cannot be sincerely contended
16 | that the combination of Plaintiff's high number of impairments (in conjunction with the effects of
17 | her medications) do not at least medically equal the severity of the criteria found under a whole
18 | host of listings including – but not limited to – the following: 20 C.F.R., Part 404, Subpt. P, Appx.
19 | 1, §§ Listing 11.08(B)[7] (Spinal cord disorders); Listing 11.14(A)[8] (Peripheral neuropathy); Listing
20 | 11.17(A)[9] (Neurodegenerative disorders of the central nervous system); Listing 11.22(1A)[10]
21 | (Motor neuron disorders other than ALS); and, Listing 1.18[11] (Abnormality of major joint(s) in

22 | _____

23 | [7] Requiring a "[d]isorganization of motor function in two extremities [], resulting in an extreme limitation
24 | [] in the ability to stand up from a seated position, balance while standing or walking, or use the upper
extremities persisting for 3 consecutive months after the disorder."

25 | [8] Same requirements as *supra* n.7.

26 | [9] Same requirements as *supra* n.7.

27 | [10] Same requirements as *supra* n.7.

28 | [11] Requiring a showing of chronic joint pain or stiffness, and abnormal motion, instability, or immobility of
the affected joint(s), and anatomical abnormality of the affected joint(s) noted on physical examination or

United States District Court
Northern District of California

1    any extremity).

2          However, even if this were not the case, given the evidence that has been herein credited as

3    true, the ALJ would still be required to find Plaintiff disabled upon the formulation of the RFC

4    because it is abundantly clear that Plaintiff has no residual capacity to function in the workplace at

5    all. Indeed, without help from her husband and daughter, Plaintiff's condition has rendered her

6    unable to even undertake such basic tasks as showering or getting dressed. When Plaintiff's

7    testimony is viewed in light of the medical evidence, the only reasonable conclusion is that she has

8    been left with no residual capacity to function in the workplace at all. Furthermore, even if one

9    were somehow able to overlook this as well, the ALJ would also be required to find Plaintiff

10   disabled based on the VE's testimony to the extent that anyone who might be off-task as little as

11   15% of the time would be unable to secure or maintain any form of employment. That is, if

12   Plaintiff is unable to use her hands, unable to effectively ambulate, unable to speak coherently

13   while medicated, and unable to maintain any degree of concentration or attention due to her ever-

14   present pain, then *a fortiori*, she would be off-task significantly more than a mere 15% of the time.

15         At this juncture, it should be noted that in cases where each of the credit-as-true factors is

16   met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

17   "serious doubt as to whether the claimant is actually disabled." *Revels v. Berryhill*, 874 F.3d 648,

18   668 n.8 (9th Cir. 2017) (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare

19   instances," as the record in this case leaves no room at all to entertain any doubt (serious or

20   otherwise) that Plaintiff has in fact been disabled, at least since her alleged onset date, if not

21   considerably earlier. Needlessly remanding a disability claim such as this one for further

22   unnecessary proceedings would only delay much needed income for claimants such as Plaintiff

23

24   _____

25   imaging, and impairment-related physical limitation of musculoskeletal functioning that has lasted, or is
     expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of
     the following: (1) a documented medical need for a walker, bilateral canes, or bilateral crutches or a
26   wheeled and seated mobility device involving the use of both hands; or (2) an inability to use one upper
     extremity to independently initiate, sustain, and complete work-related activities involving fine and gross
27   movements, and a documented medical need for a one-handed, hand-held assistive device that requires the
     use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or
28   (3) an inability to use both upper extremities to the extent that neither can be used to independently initiate,
     sustain, and complete work-related activities involving fine and gross movements.

United States District Court
Northern District of California

who are unable to work and who are clearly entitled to benefits, as doing so would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The court finds that the ALJ's unsupported conclusions in this case were thoroughly negated by the overwhelming tide of the record evidence which conclusively and convincingly established Plaintiff's disability such that no further inquiry is necessary.

**CONCLUSION**

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 15) is **GRANTED**, and Defendant's Cross-Motion (dkt. 19) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and award of benefits consistent with the findings and holdings expressed herein.

Dated: March 16, 2022

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California